IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ADA JOANN EMERY, Personal Representative of the Estate of PHILLIP WAYNE WALKER, Deceased, | ) ) ) ) ) | Case No. 8:15cv3009 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| COUNTY OF DAKOTA, a Nebraska Political Subdivision; and DOES 1-5, in their individual and official capacities, | ) ) ) ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

I.      INTRODUCTION

This matter comes before this Court based upon a Motion filed by the Defendant, County of Dakota, Nebraska, for summary judgment to be granted in its favor regarding claims filed against it in connection with the unfortunate death of Phillip W. Walker.  The medical evidence in this case shows that Mr. Walker suffered a head injury at some time within a 6 hour to 72 hour time period prior to his hospitalization on January 17, 2013, at approximately 12:01 p.m.  Prior to his hospitalization, Mr. Walker had stayed overnight at the Dakota County Correctional Facility (DCCF) after being taken into civil protective custody by South Sioux City Police on the night of January 16, 2013, for severe intoxication.  Emergency rescue services were contacted by jail staff at 11:35 a.m. on the morning of January 17, 2013, as soon as staff were able to ascertain that Mr. Walker had a medical problem, beyond his intoxication that had persisted from the night before and

1

into that very morning.

Within that 6 hour to 72 hour time frame prior to his hospitalization, Mr. Walker experienced only one significant impact fall. This occurred *prior to* Mr. Walker's admission to the DCCF on January 16, 2013. Just before he was taken into civil protective custody by South Sioux City Police that night, Mr. Walker was near a local Taco Bell restaurant and observed by eyewitnesses to fall onto his back, striking his head on pavement in a manner that was hard enough to cause the type of damage later observed by his treating physician, Dr. Matthew Johnson, M.D., and also later by the Iowa medical examiner who performed the autopsy, Dr. James Quesenberry, M.D.

Mr. Walker's above-described fall was observed by eyewitness Claribel Vizcarra, who with her boyfriend, Blake Hoch, called a 911 operator on January 16, 2013, at approximately 9:39 p.m. to report seeing a male person staggering, having difficulty with balance, and then falling backwards on his head at the Taco Bell driveway located to the west of 810 Dakota Avenue in South Sioux City, Nebraska. South Sioux City Police Officer Chad Clausen responded to the scene after the 911 Law Enforcement Center dispatcher notified him of the incident reported by two different parties at that location. Mr. Walker was then taken to the DCCF for civil protective custody (CPC) due to his severe intoxication on January 16, 2013, at approximately 10:07 p.m. Unfortunately, Officer Clausen did not relay to any staff at the DCCF that Mr. Walker had experienced a fall or injury to his head. Mr. Walker's symptoms of severe intoxication disguised the fact that he had injured himself in his earlier fall. Officer Clausen therefore did not know that Mr. Walker had suffered an injury that required medical treatment, rather, he was concerned with making sure that Mr. Walker, who was outdoors under near-freezing temperatures and believed to be homeless, had a safe place to spend the night to sleep off his intoxication.

Plaintiff Ada Joann Emery, Personal Representative of the Estate of Mr. Walker, has filed suit against the Defendant County of Dakota, Nebraska, under 42 U.S.C. §1983, and a wrongful death negligence claim, seeking damages from the County as a result of the death of Phillip W. Walker. Plaintiff claims that the Defendant County was deliberately indifferent to Mr. Walker's serious medical needs, and that his death was due to its policies, lack of training, or the actions or inactions of its jail employees. Although the

Plaintiff has not identified or amended her pleading to name any of the "DOES 1-5" referenced in her Complaint as of the date of this Motion, no employee of the County is responsible or liable for the unfortunate death of Mr. Walker, so any belated attempt that may be made to amend would not only be untimely but also futile.

Quite simply, Mr. Walker's unfortunate death was not caused by any unconstitutional policy or other actions of the Defendant County. There was no information that was ever communicated to the County that Mr. Walker had suffered a blow to his head that would have put jail staff on notice that he had a severe concussion or head injury that otherwise required any medical attention prior to his admission into the DCCF. Further, Mr. Walker's behavior during his few hours spent at the jail was consistent with his intoxication, and jail staff therefore reasonably did not realize that he had a medical issue beyond such intoxication, until he continued to exhibit strange symptoms after his blood alcohol content had measurably decreased. At that point, County jail staff promptly called for an emergency transport for Mr. Walker.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Phillip Wayne Walker was a 55 year old male with a history of alcoholism and arrests for public intoxication. (Affd. Valentino ¶7, Ex. H, Pl's Resp. to Def's Interrog. Nos. 12,13). On January 16, 2013, Mr. Walker was unemployed and did not have any permanent residence, but was staying in a motel in South Sioux City, Nebraska. (Affd. Valentino ¶7, Ex. H, Pl's Supp. Resp. to Def's Interrog. Nos. 11,15,16).

2. Claribel Vizcarra was the driver of a Dodge motor vehicle that was heading southbound on A Street in South Sioux City, Nebraska, on January 16, 2013, at approximately 9:35 p.m., after stopping for food at McDonald's with her friend, Blake Hoch, and their infant son, when she observed an older male gentleman walking, staggering, and stumbling on the sidewalk heading south on A Street toward the driveway of the local Taco Bell, and believed based on this behavior that the gentleman was intoxicated. (Affd. Valentino ¶3, Ex. A, Vizcarra Dep. 8:11-9:22; 11:7-14:13; ¶6, Ex. G, Depo. Ex. 4).

3. As Ms. Vizcarra passed this older gentlemen in her vehicle, and then stopped at the

stop sign, she looked into her rear view mirror out of concern, to continue to observe his actions when she then saw his feet fly out from under him, like he was on ice, and observed him to fall backwards onto his head from a standing position onto concrete close to the driveway area of the Taco Bell, at which time Ms. Vizcarra told her passenger, Blake Hoch, to notify the police. (Affd. Valentino ¶3, Ex. A, Vizcarra Dep. 14:14-18:7).

4.     Mr. Hoch made a call to 911 at approximately 9:39 p.m. while Ms. Vizcarra continued to observe the man who had fallen, as she was in the process of turning right from the stop sign. (Affd. Valentino ¶3, Ex. A, Vizcarra Dep. 16:24-18:7; 20:25-21:19; 22:20-23:11; ¶6, Ex. G, Depo. Exs. 1, 11, 13); (Affd. Valentino ¶3, Ex. B, Hoch Dep. 19:10-27:24; ¶6, Ex. G, Exs. 1, 2, 3, 4, 13).

5.     After the 911 call by Blake Hoch, a separate 911 call was made to the police dispatcher on January 16, 2013, by bystander Schelese Myott, who reported that she was observing an older gentlemen crawling around and struggling to get up at the driveway of the Taco Bell near A Street who appeared to need help.  (Affd. Valentino ¶4, Ex. C, Myott Dep. 14:15-19:16; 19:11-26:13; ¶6, Ex. G, Depo. Exs.18, 19, 20, 22).  Ms. Myott was with her future mother-in-law Kim Hailey near the Taco Bell entrance area when she made these observations, while driving through the drive thru area of Taco Bell, looking to the west. (Affd. Valentino ¶4, Ex. C, Myott Dep. 14:15-19:16; 19:11-26:13; ¶6, Depo. Exs.18, 19, 20, 22).

6.     Ms. Myott observed the older gentleman try to stand, that he was struggling, crawling, took his shoes off, and tried to remove his jacket, which he then pulled up over his face and laid down.   (Affd. Valentino ¶4, Ex. C, Myott Dep. 26:14-28:22; 38:10-40:10; ¶6, Depo. Exs. 20, 21, 23). Ms. Myott observed the man to again try to stand up, but he was unable to, and fell backwards.  (Affd. Valentino ¶4, Ex. C, Myott Dep. 26:14-28:22; 38:10-40:10; ¶6, Ex. G, Depo. Exs. 20, 21, 23). Ms. Myott believed the man was intoxicated, and was able at her deposition in this case to identify a photograph of Mr. Phillip W. Walker as the man she observed that night. (Affd. Valentino ¶4, Ex. C, Myott Dep. 37:4-14; ¶6, Ex. G, Depo. Ex. 23).  Ms. Myott observed a police officer arrive and talk to the man, while she and Kim Hailey

completed their drive through order at Taco Bell, and then left the area without speaking to the policeman. (Affd. Valentino ¶4, Ex. C, Myott Dep. 26:14-28:22; 38:10-40:10; ¶6, Ex. G, Depo. Exs. 20, 21).

7.  South Sioux City Police Officer Chad Clausen, badge #229, was dispatched to the Taco Bell area at 810 Dakota Avenue in South Sioux City, Nebraska, at approximately 9:39 p.m. in response to the two separate 911 calls regarding a possible intoxicated male who had reportedly fallen in that area, was staggering, and possibly obstructing traffic. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 5:10-6:6; 10:19-12:18; 13:4-17:4; 17:21-18:5; 20:14-18; ¶6, Ex. G, Depo. Exs. 16, 25). When Officer Clausen arrived, he made contact with an older male subject who was identified as Phillip Wayne Walker, and who was laying in an area by a stop sign next to the Taco Bell with an odor of alcoholic beverage on his breath. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 5:10-6:6; 10:19-12:18; 13:4-17:4; 17:21-18:5; 20:14-18; ¶6, Ex. G, Depo. Exs. 16, 25).

8.  Officer Clausen was concerned about Mr. Walker's predicament, given the weather was near freezing at 32 degrees. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 20:25-27:19). Mr. Walker was struggling to get up, and initially unable to walk very well. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 20:25-27:19). Mr. Walker told Officer Clausen he had fallen, but not how he had fallen; he had removed his shoes; said he was homeless, with no means of transportation, and had no other place that the officer could take him to which he felt was safe for him. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 20:25-27:19). Officer Clausen administered a preliminary breath test (PBT) to Mr. Walker that yielded a result of .245 mg/dl blood alcohol content, which is approximately three times the legal limit to drive. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 20:25-27:19).

9.  Officer Clausen was aware of a local homeless shelter, but knew that it closed its doors by 8:00 p.m., and did not accept folks like Mr. Walker after that. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 27:20-30:22). Officer Clausen then determined for Mr. Walker's safety that he should be taken into civil protective custody (CPC), and decided to check with the Dakota County Correctional Facility (DCCF) to see

if they had a cell available to allow him to occupy until he was able to be safely released once his blood alcohol content diminished. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 27:20-30:22).

10. Officer Clausen had previously worked as a jailer at the DCCF, and he was familiar with their booking procedures for CPC intake. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 9:12-10:18). Officer Clausen brought Mr. Walker to the DCCF, and remained for a period of time, which he estimated at less than a half hour, while Mr. Walker was asked questions during the admission/intake/booking process. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 36:24-38:25; 52:6-53:15; 68:9-69:11).

11. Officer Clausen was not told by anyone, including Mr. Walker himself, that Mr. Walker had struck his head when he fell, nor did Officer Clausen observe any obvious abrasions or cuts on Mr. Walker's head area, although Officer Clausen did inquire with Mr. Walker about whether he was hurt. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 39:19-41:1). If Officer Clausen had suspected an injury to Mr. Walker's head, he would have called "rescue." (Affd. Valentino ¶5, Ex. D, Clausen Dep. 53:20-55:15). Officer Clausen was not aware of how to tell the difference between a person who exhibits signs of intoxication, versus those of a person who has suffered a concussion or head injury. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 67:1-10).

12. Correctional Officer Michael Jacobson reported for duty to the DCCF on January 16, 2013, at approximately 2:50 p.m. (Decl. Jacobson, ¶3). At approximately 9:50 p.m., Jacobson received a call from the Law Enforcement Center (LEC) in South Sioux City, Nebraska, inquiring as to the availability at the DCCF to house an individual under CPC by a South Sioux City Police Officer. (Decl. Jacobson, ¶4, Ex. A). It was initially reported to Jacobson by dispatch at the LEC that the preliminary breath test (PBT) of the individual in question was .045 mg/dl. (Decl. Jacobson, ¶4, Ex. A).

13. Officer Jacobson contacted his supervisor, Lieutenant Brenda Kelly at her residence by phone because he was uncertain about accepting an individual under CPC who was not intoxicated and had no other reported issues. (Decl. Jacobson, ¶4, Ex. A); (Affd. Kelly, ¶3, Ex. A). Lt. Kelly instructed Officer Jacobson to call back to the LEC

and get more information about the individual, such as whether the individual had ingested drugs. (Decl. Jacobson, ¶4, Ex. A); (Affd. Kelly, ¶3, Ex. A). Officer Jacobson then contacted the LEC and was connected directly to Officer Clausen who was still at the Taco Bell scene with Mr. Walker. (Decl. Jacobson, ¶4, Ex. A). Officer Clausen informed Officer Jacobson that Mr. Walker had actually tested a BAC of .245 mg/dl, and not a .045, and that Mr. Walker was able to walk and talk, but that he had a bad knee. (Decl. Jacobson, ¶4, Ex. A); (Affd. Valentino ¶5, Ex. D, Clausen Dep. 51:3-53:15). Officer Jacobson then contacted Lt. Kelly again to provide this additional information to her, and knowing of no other concerns, Lt. Kelly agreed that Mr. Walker could come to the DCCF as a CPC hold. (Decl. Jacobson, ¶4, Ex. A); (Affd. Kelly, ¶3, Ex. A).

14.     Officer Clausen arrived at the DCCF with Mr. Walker at approximately 10:15 p.m. (Affd. Valentino ¶5, Ex. D, Clausen Dep. 56:9-16); (Decl. Jacobson, ¶5, Ex. A). Mr. Walker was able to comply with directions given by jail staff, was able to change into some furnished facility clothing without problem, although he did appear to have a limp and showed signs of intoxication. (Decl. Jacobson, ¶5, Ex. A). Mr. Walker was placed in a detox cell in order to allow for time to dissipate the affects of the consumption of alcohol. (Decl. Jacobson, ¶5, Ex. A). At no time did Mr. Walker inform Officer Jacobson that he had fallen on his head, nor injured his head in any way. (Decl. Jacobson, ¶6, Ex. A).

15.     On January 16, 2013, Correctional Officer Benjamin Brown came on duty at the jail, and was informed of Mr. Walker's CPC status due to intoxication. (Decl. Brown, ¶3-4, Ex. A). At approximately 12:00 a.m. (midnight), Brown was called to the booking area to assist with Mr. Walker in the detox cell, after he had rolled/slid off of his mattress on the bench he was sleeping on, and onto the floor, approximately 18 inches off the ground, with no injuries noted. (Decl. Brown, ¶5, Ex. A). Mr. Walker complained he was cold, so Officer Brown and others moved him into the Holding 1 cell. (Decl. Brown, ¶5, Ex. A).

16.     Around 6:00 a.m. on January 17, 2013, Correctional Officer Brown observed on video surveillance of Holding cell 1 that Mr. Walker was walking back to his bench,

when he tripped, and fell against the bench onto his side and back area. (Decl. Brown, ¶6, Ex. A). Officer Brown and another correctional officer went into Holding cell 1 and asked Mr. Walker if he was doing all right, and Mr. Walker nodded, but pointed to his back and elbow. (Decl. Brown, ¶6, Ex. A). Mr. Walker's elbow was bleeding, so ointment and a band-aid were procured for that injury. (Decl. Brown, ¶7, Ex. A). Officer Brown stayed with Mr. Walker, and instructed him to place his sleeping mat on the floor, and to not move around so much to avoid hurting himself. (Decl. Brown, ¶7, Ex. A).

17.     Correctional Officer Jeff Heitzman was on duty on January 17, 2013, and reported for his shift on that day at approximately 6:40 a.m., and received pass down information from the prior shift that Mr. Walker was there under CPC in holding cell 1 and was still intoxicated with a PBT test result of .141 mg/dl about an hour prior at 5:45 a.m. (Decl. Heitzman, ¶3, Ex. A).

18.     At approximately 11:15 a.m., Officer Heitzman made contact with Mr. Walker to see if his blood alcohol content (BAC) had diminished enough to be released. (Decl. Heitzman, ¶4, Ex. A); (Affd. Kelly, ¶4-5, Ex. A). Mr. Walker tested .023 mg/dl on the PBT, which was low enough for his release to be permitted. (Decl. Heitzman, ¶4, Ex. A); (Affd. Kelly, ¶4-5, Ex. A). Mr. Walker had vomited on himself, and officers began to make arrangements for him to take a shower before being released. (Decl. Heitzman, ¶4, Ex. A); (Affd. Kelly, ¶4-5, Ex. A). Mr. Walker was unsteady on his feet, his left side did not appear to be functioning properly, and officers began to ask Mr. Walker questions to assess his condition, which Mr. Walker only partially answered correctly. (Decl. Heitzman, ¶4, Ex. A); (Affd. Kelly, ¶4-5, Ex. A). Shortly thereafter, Mr. Walker attempted to stand and walk on his own, but he lost his balance, tripped over a mattress on the floor, and struck the left side of his face and forehead against the wall of the holding cell. (Decl. Heitzman, ¶4, Ex. A); (Affd. Kelly, ¶4-5, Ex. A).

19.     Officer Heitzman, a trained volunteer EMT in Iowa, and Lt. Kelly immediately came to Mr. Walker's assistance, as did licensed practical nurse Marjorie Donahue, who serves as the facility medical director. (Affd. Donahue, ¶2-5, Ex. A); (Decl.

8

Heitzman, ¶4-5, Ex. A); (Affd. Kelly, ¶4-5, Ex. A). Marjorie Donahue performed a series of diagnostic preliminaries to assess Mr. Walker's condition, while Officer Heitzman and Lt. Kelly assisted Nurse Donahue in assessing Mr. Walker by checking his motor functions. (Affd. Donahue, ¶3-5, Ex. A); (Decl. Heitzman, ¶4-5, Ex. A); (Affd. Kelly, ¶4-5, Ex. A).

20.     Given that Mr. Walker was at this point no longer intoxicated, Nurse Donahue and the other officers became concerned that Mr. Walker was affected by some other medical condition or injury, and immediately summoned the Dakota City Rescue to transport Mr. Walker by ambulance in emergency fashion to the nearest hospital facility at Mercy Medical Center in Sioux City, Iowa. (Affd. Donahue, ¶5, Ex. A); (Decl. Heitzman, ¶4-5, Ex. A); (Affd. Kelly, ¶4-5, Ex. A).

21.     Once Mr. Walker arrived by ambulance at the Mercy Medical Center in Sioux City, Iowa, at approximately 11:59 a.m, he was assessed in the Emergency Room with a CT scan, which allowed the determination that he had suffered a severe head injury to the mid-right side, and right rear area of his skull. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep. 9:17-10:11; 19:5-22:14; 48:11-16). Mr. Walker's care was transferred over to Dr. Matthew Johnson, M.D., a neurosurgeon, who assessed Mr. Walker's condition, ordered various radiologic scans of his skull, and operated on Mr. Walker in an attempt to save his life. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep. 4:7-19; 9:25-10:11;13:12-17:6). Despite his best efforts, Dr. Johnson realized that the severity of the impact to the skull of Mr. Walker was to be fatal, and after several days Mr. Walker's family authorized that he be removed from life support. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep. 13:12-18:16).

22.     Dr. Matthew Johnson, M.D., who has been board certified in neurosurgery since 2011, testified to several of his considered opinions at the time of his deposition, as follows (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep., 5:5-10):

22.1    That even if Mr. Walker had been taken immediately to the Emergency Room from the scene of the Taco Bell incident call on January 16, 2013, at 9:39 p.m., Mr. Walker likely would not have survived the significant head injury he had suffered prior to such hospital admission. (Affd. Valentino, ¶5,

Ex. F, Dr. Johnson Dep. 19:14-22:14; 41:9-45:4).

22.2. That based on his observation that Mr. Walker's brain was atrophied, Mr. Walker's alcoholism was a contributing factor to his head injury. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep. 45:5-46:25).

22.3. That based on his review of the CT scans taken over a time period while he had treated Mr. Walker, the significant brain injury to the mid right side and right rear of his skull occurred within a period of no less than 6 hours to 72 hours from the initial impact. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep. 24:4-17; 34:9-36:12).

22.4. That a fall backwards onto the right side and rear area of the skull from Mr. Walker's height, as described by witness Claribel Vizcarra, would be consistent with and sufficient to cause the severe brain injury exhibited by Mr. Walker at the time of his hospitalization. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep. 41:9-45:4; 45:5-47:9; 47:1-49:6).

23. Dr. James Quesenberry, the board certified Iowa Medical Examiner, performed an autopsy on the body of Mr. Walker, and offered the following opinions at his deposition:

23.1. That it would have taken a significant impact to the right mid-side of Mr. Walker's skull to cause the right side fractures and severe brain injury he observed to Mr. Walker at autopsy. (Affd. Valentino, ¶5, Ex. E, Dr. Quesenberry Dep. 19:24-21:9; 63:3-11).

23.2. That Mr. Walker's falls at the jail under the circumstances described to him would not have caused such an injury, and that the fall had to be at least from Mr. Walker's full height and impacting the mid right side of his skull in order to cause the damage he observed at autopsy. (Affd. Valentino, ¶5, Ex. E, Dr. Quesenberry Dep. 22:23-28:14).

23.3. That the fall of Mr. Walker as described by Claribel Vizcarra would have been sufficient to cause the damage he observed at autopsy. (Affd. Valentino, ¶5, Ex. E, Dr. Quesenberry Dep. 22:23-28:14).

24. Dr. Johnson and Dr. Quesenberry both opined at deposition that the symptoms of

intoxication and a head injury are very similar, with the caveat that the odor of alcoholic beverage and no obvious reported wound to the head, could mislead even a medically trained person into believing that intoxication is more the likely cause of the patient's behaviors, than a head injury. (Affd. Valentino ¶5, Ex. F, Dr. Johnson Dep. 27:2-28:20; 53:3-10); (Affd. Valentino ¶5, Ex. E, Dr. Quesenberry Dep. 29:24-31:13).

25. Captain Randy Walsh, as current Captain of the Sheriff's Department stationed at the DCCF, is a records custodian of the policies and procedures regarding the intake and medical screening of inmates, including medical care to be provided to detainees and those in its care and custody, and he verifies that all of the facility records submitted as evidence in this case were generated and kept in the ordinary course of the facility operations of DCCF, and were required to be prepared contemporaneous with the events described therein. (Affd. Walsh, ¶1-4).

26. The DCCF maintains a written policy regarding receipt of inmates who are at risk to themselves or others, which provides guidance for officers to try to detect brain traumas and when a person may so intoxicated as to require immediate medical treatment. (Affd. Walsh, ¶5, Attachment). This policy prohibits the staff of the facility from admitting to the jail without physician's examination for fitness for incarceration, anyone who is so intoxicated that he or she is unable to stand or walk and talk, who is incoherent due to known drug ingestion, or who has a known or obvious serious traumatic physical injury. (Affd. Walsh, ¶5, Attachment).


III.   ARGUMENT

As outlined in Plaintiff's Complaint, the asserted causes of action are under 42 U.S.C. §1983 (excessive punishment, deliberate indifference to medical needs, due process, and equal protection), the Nebraska Constitution as applied through Neb. Rev. Stat. §20-148, and §30-809 (Wrongful Death), and §13-901, *et. seq*. (Political Subdivisions Tort Claims Act). Punitive and other damages are sought in the Complaint. Each of Plaintiff's claims asserted in this case fail as a matter of law for a variety of reasons, as detailed below.

A.    PLAINTIFF'S FEDERAL 42 U.S.C. §1983 CLAIMS FAIL AS A MATTER OF LAW

The initial question to be answered with respect to Plaintiff's federal claims under 42 U.S.C. §1983 is what particular constitutional amendment applies to a person who is in civil protective custody and asserts his medical needs were not sufficiently addressed. The Eighth Circuit Court of Appeals recently decided a case where an involuntarily committed individual to a detox center was injured while in custody and sued for both excessive force and denial of medical care. In <u>Hall v. Ramsey County</u>, 801 F. 3d 912, 920 (8th Cir. 2015), the Court of Appeals stated that Hall's right to medical care while involuntarily committed arises under the Due Process Clause of the Fourteenth Amendment:

> To analyze denial of medical care claims, however, "we apply the deliberate-indifference standard that governs claims brought...under the Eighth Amendment." Whether an official was deliberately indifferent requires "both an objective and a subjective analysis." "Under the objective prong [Hall] must establish that he suffered from an objectively serious medical need." "Under the subjective prong, [Hall] must show that an official actually knew of but deliberately disregarded his serious medical need." (internal citations omitted).
> <u>Id</u> at 920.

The inquiry under the Fourteenth Amendment Due Process Clause for claims against jail facilities and their employees associated with the death of a detainee in custody generally starts with whether jailers were deliberately indifferent to the objectively serious medical needs of the detainee. <u>Scott v Benson</u>, 742 F.3d 335 (8th Cir.2014). It should be noted that Plaintiff supplies no allegations that would sustain any cause of action under the Equal Protection Clause.

1.    CLAIMS AGAINST UNIDENTIFIED "DOE" EMPLOYEES ARE UNTIMELY AND WOULD BE FUTILE

It is also important to note that although "Does 1-5" are referenced in the Complaint, the progression deadline to amend the Complaint to identify and add any such individuals has long since passed, as of July of 2015. (Doc. 12). This deadline was not extended by the subsequent amended progression order. (Doc. 29). There can be no viable claims asserted against unidentified "Does" at this summary judgment stage of the proceedings,

absent a proper amendment to the pleading. However, even if Plaintiff were to belatedly seek leave to amend to identify "Does," the Court need not delay entering summary judgment in Defendant's favor to permit any such amendment under the circumstances of this case, because any such amendment would be futile. *See* United States of America ex rel Gaudineer and Comito v State of Iowa, 269 F.3d 932 (8th Cir. 2001) (leave to amend may be denied on the basis of futility, if the court finds that the proposed amendment would fail to state a cognizable claim); Marmo v Tyson Fresh Meats, 457 F.3d 748 (8th Cir. 2006) (same).

If any individual jail employees were to be named as Defendants in this case, they would have the defense of qualified immunity available to them. None of them could be held liable unless subjectively aware that his or her action(s) were violating a clearly established constitutional right of Mr. Walker, with a "mental state akin to criminal recklessness." Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006). For all the reasons described below, the evidence submitted herein by Defendant Dakota County conclusively demonstrates that no Dakota County jail employee could be held liable individually in this case. Therefore, summary judgment must be granted as to any claims asserted or that may be sought to be asserted against any and all unidentified "Does" otherwise referenced in the Complaint.

2.    COUNTY LIABILITY IS PRECLUDED, BECAUSE THERE WAS NO DELIBERATE INDIFFERENCE TO PHILLIP WALKER'S SERIOUS MEDICAL NEEDS UNDER THE CIRCUMSTANCES OF THIS CASE, THE MEDICAL EVIDENCE ESTABLISHES A LACK OF CAUSATION, AND IN ANY EVENT THERE WAS NO POLICY, CUSTOM, OR FAILURE TO TRAIN THAT WAS THE MOVING FORCE BEHIND ANY ALLEGED DELIBERATE INDIFFERENCE

For purposes of a civil rights claim brought pursuant to 42 U.S.C. §1983, it is well established that there can be no liability under a respondeat superior theory. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018 (1978); Vaughan v Greene County, Arkansas, *supra*; Luckert v Dodge County, *supra*. Instead, a governmental entity can be held liable for the acts of its employees in contravention of an individual's civil rights

only upon a showing of an unconstitutional act by a "policymaker," or the existence of some unlawful policy, custom, or a failure to train, which is the motivating force that caused the constitutional violation. Id.

There must be an underlying predicate constitutional violation by one or more individual employees in order for municipal liability to attach under either a "policy/custom" or "failure to train" theory. Brockington v. City of Sherwood , Ark., 503 F.3d 667 (8th Cir. 2007); Loefffler v. City of Anoka, 79 F.Supp.3d 986 (D. Minn. 2015) (noting that where all constitutional claims against individually named defendants fail, dismissal of the municipal liability claims is warranted). Because no individual jailers were named or served with process in the instant case, and the only Defendant who has been named or been served is a governmental entity (the County), the unnamed jail employees' actions are essentially irrelevant to the issue of an unconstitutional "policy" claim. See, Jenkins v. Hennepin County, 557 F.3d 628, 632, n.3 (8th Cir. 2009) (finding actions of prison nurse not named as defendant in §1983 suit were not material to summary disposition of claim). In any event, in order for any jail employee, let alone the Defendant County, to be responsible for any medical condition of Plaintiff's decedent, Phillip W. Walker, while he was housed in civil protective custody at the Dakota County Correctional Facility (DCCF), at least one County employee must first actually know that such serious medical condition existed in the first place, or the serious medical condition must be obvious to a layperson, before it is even necessary to reach the question of whether any of them deliberately disregarded such serious medical need.

In this particular case, the evidence shows that Mr. Walker suffered a serious head injury prior to his placement with the DCCF on January 16, 2013, as an individual who had been taken into civil protective custody by a different law enforcement agency. The evidence shows that the South Sioux City Police Officer, Chad Clausen, who initially had contact with Mr. Walker, was not advised by anyone that Mr. Walker had recently suffered a fall in which he struck his head on concrete. Officer Clausen specifically inquired with Mr. Walker about whether he had any injuries, to which Mr. Walker responded that he had none except a bad knee. When Officer Clausen evaluated Mr. Walker's situation at the scene of the Taco Bell driveway area, he believed he was dealing with a very intoxicated

older male, exposed to the elements of winter, who was homeless, without transportation, and was in need of being protected for his own safety until time would permit the effects of alcohol to dissipate. Because he did not know of any potential head injury himself, Officer Clausen did not communicate anything to the jail employees at the DCCF that would have alerted them that Mr. Walker had suffered a head injury prior to his admittance in civil protective custody, although the jail staff made appropriate inquiries in accordance with their policy to determine whether Mr. Walker had any injuries about which they should be concerned, or which would require medical clearance from a physician prior to admittance.

In <u>Jones v Minnesota Department of Corrections,</u> 412 F. 3d 478 (8th Cir. 2008), a female prisoner, Brenda Jones, was sentenced to prison, but was held for three days in the Blue Earth County jail awaiting transfer to the state department of corrections at Shakopee. Upon transfer to the state corrections facility at Shakopee, she was observed to become more non-responsive to staff inquiry, uncooperative, and appeared sick. Staff at the prison included a nurse who checked on her, or otherwise observed her condition deteriorate. During the third shift, at which time approximately 12 hours had passed since she had been at the prison, a corrections officer checked and found her totally unresponsive. Prison emergency medical staff performed CPR and Jones was pronounced dead at 9:35 p.m. An autopsy showed she died of pulmonary edema. During her 12 hours at the state prison in Shakopee, Jones never told anyone that she had needed medical attention, but complained that her feet, neck, and arm hurt. The Eight Circuit Court of Appeals noted the following in affirming a summary judgment in favor of the state corrections department and staff:

> ...[H]ere Jones was not diagnosed by a physician as requiring treatment. Therefore, Jones' condition must have been so obvious that a layperson would easily recognize the need for treatment. On the undisputed facts of this case, no reasonable jury could find that Jones suffered from an objectively serious medical need. ...
> ...[T]he determination whether a medical need is sufficiently obvious cannot be analyzed in a vacuum. The prison officials' background knowledge is part of the analysis. (internal citation omitted).
> <u>Id</u> at 482.

Further, in <u>Miller v Calhoun County</u>, 408 F.3d 803 (6th Cir. 2005), a pretrial detainee's estate sued alleging deliberate indifference to the detainee's serious medical need after he died in jail of an undiagnosed brain tumor. Jail paperwork contained some inconsistent reporting that the detainee had suffered a head injury "one month earlier," and in other places the injury was noted as a "year and a half ago," but the detainee was not symptomatic at time of booking. The County defendant was granted summary judgment which was affirmed on appeal, as there was no clear and persistent pattern of medical mistreatment of detainees, or any unconstitutional policies or practices the County engaged in to deny medical treatment of detainees. *See also*, <u>Craig v Floyd County, Georgia</u>, 643 F. 3d 1306 (11th Cir. 2011) (no prior unconstitutional policy or practices regarding lack of inmate referral to physician existed in claim asserted by pretrial detainee who alleged he had suffered head fractures prior to his incarceration that were not diagnosed for nine days despite a medical screening at the jail).

Finally, in <u>Qian v. Kautz</u>, 168 F.3d 949 (7th Cir. 1999), the Seventh Circuit affirmed summary judgment granted in favor of jailers on a §1983 claim brought by an arrestee who was held for 72 hours before receiving treatment for a head injury he incurred in a car accident prior to entering the jail. The Court found that the jailers could not be held liable for failing to recognize that the arrestee had suffered a head injury prior to entering the jail in the absence of any evidence that they actually knew of his preexisting head injury, and where there was evidence that jailers believed that the arrestee was merely intoxicated or under the influence of drugs for the first 72 hours of his stay at the jail. The Seventh Circuit held that although it might be considered unreasonable that the jailers believed that the arrestee was intoxicated for such a lengthy time period as 72 hours, when he did not smell of alcohol and all tests were negative. Yet, there was no evidence that the jailers' belief was not honestly held, given that the arrest had been for driving while impaired, the jailers were not told of the car accident, and there was no visible physical injury. The Court concluded there was no evidence that any indifference exhibited was "deliberate."

Here, again, the jail staff simply did not know or have means to know that Mr. Walker had a serious medical injury. There is no evidence here that the Defendant County or its employees were provided information that Mr. Walker had suffered a head injury prior

to his being removed on January 17, 2013, to Mercy Medical Center, nor was there a prior incident wherein a policy or custom existed to deny an inmate medical care for a head injury that was an objectively serious medical need that would have required medical attention. Further, the DCCF staff would not be in a position to differentiate between a head injury versus the intoxication level of Mr. Walker given that no observable wound to the head was apparent, no complaint of an injury to Mr. Walker's right side of his head was made, and until his level of intoxication was below .04 mg/dl, did the staff realize some other medical condition was at play.

Defendant has also established a lack of causation between any jail employee conduct and Mr. Walker's unfortunate death, as would be necessary to sustain the federal claims here.

The evidence establishes that Mr. Walker's head injury was sustained prior to his admission to the jail and not while he was at the jail. The evidence contains the eyewitness testimony to Mr. Walker's fall near the Taco Bell parking lot from a standing position at his full height, wherein he was visibly intoxicated, and struck his head on concrete, with sufficient force that Claribel Vizcarra was compelled to tell her companion, Blake Hoch, to contact police. Another witness, Schelese Myott, likewise reported that she observed Mr. Walker crawling around and struggling to get up.

Although Mr. Walker had a couple of minor falls while at the jail that impacted other areas of his body, the evidence establishes that jail staff reasonably attended to these, and that such falls could not have been the cause of the brain trauma that killed him. Dr. Matthew Johnson, M.D., the neurosurgeon who operated on Mr. Walker, neurosurgery since 2011, testified that based on his review of the CT scans of Mr. Walker's head, the significant brain injury to the mid right side and right rear of his skull occurred within a period of no less than 6 hours to 72 hours from the initial impact, and that the fall described by the eyewitnesses at the Taco Bell scene was consistent with the damage he observed. (Affd. Valentino, ¶5, Ex. F, Dr. Johnson Dep., 19:14-22:14; 34:9-36:12; 41:9-45:4; 45:5-47:9; 47:1-49:6). Dr. James Quesenberry, the board certified autopsy examiner of the body of Mr. Walker, agreed that it would have taken a significant impact to the right mid-side of Mr. Walker's skull to cause the severe brain injury he observed to Mr. Walker at autopsy.

Dr. Quesenberry further opined that Mr. Walker's minor falls at the jail under the circumstances described to him would not have caused such an injury, and that the fall had to be at least from Mr. Walker's full height and impacting the mid right side of his skull in order to cause the damage he observed at autopsy.

Most telling on the causation issue here is Dr. Johnson's testimony at deposition if Mr. Walker had been taken immediately to the Emergency Room from the scene of the Taco Bell incident call on January 16, 2013, at 9:39 p.m., Mr. Walker would not have survived the significant head injury he had suffered prior to such hospital admission. Dr. Johnson noted that Mr. Walker's brain was atrophied, such that Mr. Walker's alcoholism was a contributing factor to the trauma. The medical evidence demonstrates as a matter of law that there is no causation between any action of DCCF staff and the death of Mr. Walker.

But even if some jail employee had known of and exhibited deliberate indifference to Mr. Walker's medical needs, again, County liability for purposes of a §1983 claim would require the further step for Plaintiff to establish the existence of an unlawful "policy, "custom" or "failure to train" that was the "moving force" behind the jail employee's deliberate indifference. It is well recognized that "policy" as referred to in §1983 claims requires pointing to a formally promulgated County policy, such as an ordinance, rule, or regulation. Jenkins, *supra*, 557 F.3d at 633-634. In contrast, to establish an unlawful "custom" for purposes of §1983, the plaintiff must show "a continuing, widespread, persistent pattern of unconstitutional misconduct." Id. It therefore follows that proof of a single incident of unconstitutional conduct is insufficient to establish liability of a municipal government. Jenkins, *supra*, 557 F.3d at 633-634; Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292 (1986). As noted in Luckert v Dodge County, 684 F.3d 808, 820:

> Luckert effectively has shown flaws in Dodge County's practices, but has not demonstrated the 'continuing widespread, persistent pattern of constitutional misconduct' necessary to find the county liable.(citation omitted). While we expect that jailers will learn from their failures in preventing suicide, they are not constitutionally liable for every failure, only those where they are deliberately indifferent to the risk of suicide. (citation omitted).

Even if unlawful policies or customs do exist, to establish a cognizable due process claim under §1983, the plaintiff must also show that said policies or customs "shock the conscience," which is a question of law for the judge, not a question of fact for the jury. Terrell v. Larson, 396 F.3d 975, 979-81 (8th Cir. 2005).

In this instance, Plaintiff's Complaint seems to allege that the unlawful "policy or custom" of Defendant County was generally to be deliberately indifferent to the objectively serious medical needs of their detainees/inmates who had medical issues. No specific promulgated policy of Dakota County is pointed to. The evidence shows that the DCCF had in place at the time of Mr. Walker's admission as a CPC a detailed policy aimed at guiding jailers in inquiring and observing to ensure that any new booking known to have a serious medical issue would obtain a fitness for incarceration examination from a physician prior to admission to the jail. This policy clearly would have resulted in Mr. Walker having been taken for clearance had the jail staff been told or been able to detect any head injury or even known that he had suffered the type of fall that he did prior to his arrival. However, Mr. Walker's head injury was not visible, and no symptom of the same could be ascertained due to Mr. Walker's high level of intoxication. There is no evidence of any prior CPC accepted at the DCCF who was allegedly not afforded appropriate medical attention. Defendant has established for purposes of summary judgment that there is no policy or custom that would create liability of the County in this case. *See* Russell v. Hennepin County, 420 F.3d 841 (8th Cir. 2005) (county detention center's policy regarding conditional release did not cause six days of prolonged detention when, at worst, injury was caused by failure to assiduously follow the policy, not from any "obvious" inadequacy in the policy that was clearly "likely to result in the alleged deprivation of constitutional rights").

With respect to the alleged "failure to train," only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under §1983. City of Canton v. Harris, 489 U.S. 378, 380 (1989); Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011); Folkerts v. City of Waverly, 707 F.3d 975 (8th Cir. 2013). It will not suffice to prove a particular employee was unsatisfactorily

trained, neither will it suffice to prove that an injury or accident could have been avoided if an employee had "better or more training." Canton, *supra* at 391. Adequately trained personnel "occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." Id. at 391. As noted by the Eighth Circuit Court of Appeals in Vaughan v Greene County, Arkansas:

> Under this [failure to train] theory of liability, Vaughan must demonstrate Sheriff Langston 'was deliberately indifferent to or tacitly authorized the offending acts'. (citation omitted). Vaughan fails to do so. We cannot say Sheriff Langston's practice of delegating to others such duties as reading mail and responding to communications regarding Jail inmates amounts to deliberate indifference. Moreover, there is no indication from the record Sheriff Langston had notice his policies, training procedures, or supervision were inadequate and likely to result in a constitutional violation. (citation omitted).
> Id at 851.

Here, the medical evidence shows that there was no definitive distinction between the symptoms of an intoxicated individual, like Mr. Walker (who exhibited a smell of alcoholic beverage and signs of impairment at booking), and a person with a head injury, unless one is informed of a fall with injury to the head. In addition, the actions of each of the jail staff members having any direct contact with Mr. Walker shows that they were adequately trained in the jail's policies and procedures, and in being alert for signs of medical distress conditions that become emergent, as well as how to respond to such medical emergencies. There is no evidence of lack of adequate training as relates to the employees at the DCCF. Even if there were, there is no causal tie between any bare claimed lack of training and Mr. Walker's death from an unreported head injury. As noted in Lucero v Bush, 737 F. Supp. 2d 982, 1011 (Dist. Ct. S. Dak. 2010):

> [I]t is not enough for a 1983 plaintiff to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was 'the moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

There is no evidence in the record, nor allegations that would support Plaintiff's "failure to train" claim, which is asserted as nothing more than an unsupported conclusory statement

in the Complaint.

In summary, Plaintiff's claims against the County fail because there is no evidence of any jailer exhibiting deliberate difference toward Mr. Walker's medical needs, in fact, the jailers did not know of any head injury suffered by Mr. Walker, and further, the jail's policy and training as shown by the evidence were not constitutionally inadequate. In the final analysis, whatever alleged treatment, policy, or training inadequacies are alleged, in addition to those being unsupported, the medical evidence shows conclusively that any such inadequacies were not the cause of Mr. Walker's death.

B.     PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW

1.     JAIL EMPLOYEES ARE IMMUNE FROM LIABILITY FOR THEIR EFFORTS TO HOUSE A PERSON IN CIVIL PROTECTIVE CUSTODY

Under Nebraska law, specifically Neb. Rev. Stat. §53-1,121(1) (Reissue 2010), law enforcement officers are permitted to take a person who is intoxicated, and in the judgment of the officer dangerous to himself or others, or is otherwise incapacitated, from any public or quasi-public property, and place them into protective custody for no longer than 24 hours. Such provisions of state law authorize reasonable efforts by police to take such person to his home, or to any hospital, clinic, alcoholism center, or to a doctor to preserve life or to prevent injury, subject to feasability or lack of success in placement outside a jail facility. Further, the placement of such person in civil protective custody is to be recorded at the facility or jail in which they are delivered, and notification then made to family, or another, if so designated by the person in protective custody, and if they can be located. The state law further provides that the law enforcement officer who "acts in compliance with this section is deemed to be acting in the course of their official duty," and is not to be held liable either civilly or criminally for such actions. Thus, a statutory immunity otherwise exists for those officers who encounter individuals that are taken and held in civil protective custody for the 24 hour period, as it is not considered an arrest.

The immunity afforded by Neb. Rev. Stat. §53-1,121(1) bars any civil state law claim asserted by Plaintiff.

2.     NO CAUSE OF ACTION EXISTS UNDER THE NEBRASKA CONSTITUTION UNDER THE FACTS OF THIS CASE

The allegations in paragraph 9 of Plaintiff's Complaint purport to assert a claim under Article I, §3 and Article I, §7 of the Nebraska Constitution, "for a violation of his [Walker's] right to be free from search and seizure" and a "violation of Plaintiff's due process civil rights."

In McKenna v. Julian, 277 Neb. 522, 763 N.W.2d 384 (2009), an arrestee sued the City of Omaha and city officers for, among other claims, a violation of Article I, Sec. 7 of the Nebraska Constitution.  In upholding the dismissal of such claim for lack of subject matter jurisdiction, the Nebraska Supreme Court held that whether or not such provisions of the Nebraska Constitution are self-executing, giving rise to a private right of action for damages, "the existence of a self-executing constitutional right does not entail waiver of the state's sovereign immunity from suit based upon such right."  763 N.W.2d at 390.

Further, Neb. Rev. Stat. §20-148 (Reissue 2007) explicitly prohibits civil actions against a political subdivision based on constitutional violations.  As noted in McKenna, *supra*:

> This only provides further evidence that our Legislature has not intended to waive sovereign immunity for implied causes of action under our constitution.
> 277 Neb. at 530.

The specific exemption for political subdivisions in Neb. Rev. Stat. §20-148 likewise extends to employees/officials of political subdivisions.  Sinn v. City of Seward, 3 Neb. App. 59 (1994); Buzak v. Pawnee County, Nebraska, 207 F.Supp.2d 961 (D. Neb. 2002). Plaintiff has no cause of action under paragraphs 9, 15, or 21 of her Complaint against the County as asserted under the Nebraska Constitution, Neb. Rev. Stat. §20-148, and this Court lacks subject matter jurisdiction over any such claims so asserted.

C.     PUNITIVE DAMAGES ARE NOT PERMITTED AGAINST THE NAMED COUNTY DEFENDANT

It is well established that punitive damages cannot be entered against a municipality such as the County of Dakota, Nebraska, as a matter of law.  City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981); Williams v. Butler, 746 F.2d 431 (8th Cir. 1984) (finding that punitive damages award against City could not stand, and City's right to object to such award could not be waived); Bruhn v. Foley, 824 F.Supp. 1345, 1358 (D.

Neb. 1993) (observing that punitive damages are not available against counties under Newport). Here, Plaintiff's requests for punitive damages in her Complaint, is not legally unauthorized against the County.

CONCLUSION

First, and foremost, the County jail staff was unaware that Mr. Walker had suffered a head injury, as no one, including Mr. Walker, reported that he had fallen and injured his head prior to his admission. Additionally, Mr. Walker's intoxication level was such that any symptoms of a head injury were masked by such level of intoxication. Jail staff acted promptly at the first opportunity they had to observe that another likely medical issue existed, at which time Mr. Walker was examined by the jail nurse and then immediately transported to the hospital by ambulance.

Even if any deliberate indifference could be found under these facts, the County is the only named Defendant in this case, and cannot be held liable in the absence of a policy, custom or practice of the County being the "moving force" that caused Mr. Walker's injuries. But Dakota County policy specifically guards against deliberate indifference to a serious medical need of a person being involuntarily held at the jail for their own protection, and there is absolutely no evidence that any unlawful policy, custom, or failure to train Dakota County jail staff caused or exacerbated the injuries of Mr. Walker.

Indeed, the unrefuted medical testimony is that the injury sustained by Mr. Walker was incurred outside the confines of the jail, was likely sustained from a fall at his full height, and that Mr. Walker's head injury was so severe, he likely would have died even if he had been taken directly from the scene of the Taco Bell to the hospital without even stepping foot in the jail facility of the Defendant County. For all of those reasons discussed above, the Defendant County is entitled to a summary judgment in its favor, and that the Complaint of Plaintiff be dismissed.

DATED this 22nd day of February, 2016.

Respectfully submitted,

COUNTY OF DAKOTA, NEBRASKA,
Defendant.

BY:    s/ Vincent Valentino
        Vincent Valentino, #14288
        Brandy Johnson, #23323
        Nebraska Telephone Building
        130 South 13th Street, Suite 300
        Lincoln, NE 68508
        (402) 742-9240
        vv@windstream.net
        brandy@nrmainc.info

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of the same to Plaintiff's counsel, Christopher P. Welsh and James R. Welsh, of Welsh and Welsh, P.C., L.L.O., 9290 West Dodge Road, 204 The Mark, Omaha, NE 68114.

BY:    s/ Vincent Valentino
        Vincent Valentino, #14288